**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CASE NO: 2:18-CR-22** |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **STEPHEN KELLY, et al.** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Bobby L. Christine, United States Attorney for the Southern District of Georgia, and undersigned counsel, Assistant United States Attorneys for said District, hereby submits its Sentencing Memorandum in the above-styled case.

## I.   STATEMENT OF ISSUE

Whether, under 18 U.S.C. § 3553(a), Defendants should be sentenced to a term of imprisonment within the advisory guideline range as determined by the United States Sentencing Commission Manual.

## II.   STATEMENT OF THE CASE

### a.  Factual Background

#### i.  Kings Bay

Naval Submarine Base Kings Bay ("Kings Bay"), located on almost 17,000 acres of land in Kingsland, Georgia, is surrounded by 26 miles of perimeter fencing. (Doc. 411 at 1-2).  Posted on the perimeter fencing are signs warning against unauthorized entry as Kings Bay is the only strategic weapons facility on the eastern seaboard.  (Doc. 411 at 2).  "Kings Bay is also home port to eight Ohio-class

submarines (including six feet ballistic missile submarines and two guided missile submarines)." (Doc. 411 at 2-3). "The ballistic missile submarine force 'provides the United States with its most survivable nuclear strike capability' and is vital to 'deterring [any] surprise nuclear attack.'" (Doc. 411 at 3) (quoting (Doc. 227-1 at 3)).

Due to the nature of these assets at Kings Bay, only persons with proper credentials are permitted to enter the base. (Doc. 411 at 3). Every person coming on or off Kings Bay must enter and exit through three marked gates—the Franklin Gate, the Stimson Gate, and the Madison Gate. (Doc. 411 at 3). These areas, which are not open to the public, are guarded by the armed Naval Security Force. (Doc. 411 at 3). The Naval Security Force considers all unauthorized intrusion "as an indication of hostile intent" against which deadly force is authorized. (Doc. 411 at 3). "More sensitive areas . . . are protected by additional barriers and security protocols." (Doc. 411 at 4). "One of these is referred to as the 'Limited Area.'" (Doc. 411 at 4). "Written warnings posted on the fencing surrounding the Limited Area advise that deadly force may be used against unauthorized intruders, and a broadcast system plays a recurring announcement . . . every eight to nine minutes:" "'Warning. This is a restricted area. Use of deadly force is authorized.'" (Doc. 411 at 4); (Doc. 504 at 14) (quoting (Doc. 316 at 225)).

### ii. Offense

Defendants Stephen Michael Kelly, Mark Peter Colville, Clare Therese Grady, Martha Hennessy, Elizabeth McAlister, Patrick O'Neill, and Carmen Trotta

("Defendants")[1] are members of the PlowShares Movement, a Roman Catholic protest and activist group opposed to nuclear weapons. (Doc. 411 at 2). After two years of planning, late on April 4, 2018 into the early morning hours of April 5, 2018, Defendants, "equipped with bolt cutters, spray-paint, [bottles of blood, banners with messages against nuclear weapons,] and a hammer made of melted-down guns," entered Kings Bay to protest the Government's possession of nuclear weapons.[2] (Doc. 411 at 1). They cut a padlock and opened a gate. (Doc. 411 at 1). Once inside, they split into three groups. (Doc. 411 at 4). O'Neill and Colville went to the static missile display area of the base inside the main perimeter "and left painted messages, poured blood, took down the letters on a sign, and hit concrete statues of missiles with a hammer." (Doc. 411 at 1, 4). Grady and Hennessy "walked to the [Strategic Weapons Facility, Atlantic ("SWFLANT")] engineering services building" where they "spray-painted messages on the sidewalk" and "poured blood on the ground outside of the building before joining" O'Neill and Colville at the static missile display. (Doc. 411 at 4). The remaining three, McAlister, Trotta, and Kelly, "cut through a fence and concertina wire," entered the Limited Area, "unfurled their banners and prayed." (Doc. 411 at 5).

---

[1] The Government collectively refers to the defendants as "Defendants" and individually refers to them by their last names.

[2] "[T]he presence of nuclear weapons onboard [Kings Bay] or any of the Trident submarines that are homeported there," can "neither be confirm[ed] publicly nor den[ied]." (Doc. 411 at 6 n.5).

Defendants were quickly located and arrested by base personnel. (Doc. 411 at 2). No one was physically harmed though Defendants caused over $30,000 worth of damages to the United States Navy. *See* (Doc. 504 at 17); *See, e.g.*, Kelly PSR at 6.[3]

### b. Proceedings

On May 2, 2018, a Southern District of Georgia grand jury returned a four-count indictment against Defendants. (Doc. 1). The Government charged Defendants with: (1) conspiracy under 18 U.S.C. § 371; (2) destruction of property on a naval installation under 18 U.S.C. § 1363; (3) depredation of government property under 18 U.S.C. § 1361; and (4) trespass under 18 U.S.C. § 1382. (Doc.1). On July 2, 2018, Defendants moved to dismiss the indictment on the following grounds: (1) unlawful prosecution under the Religious Freedom Restoration Act of 1993; (2) selective and vindictive prosecution; (3) duplicitous and multiplicitous counts; and (4) failure to state an offense under international and domestic law.[4] (Doc. 504 at 3; Docs 87, 102, 118, 122, 141, 158, 171). On November 7 and 19, 2018, Magistrate Judge Cheesbro held evidentiary hearings on the matter. (Doc. 411 at 9). In an order filed April 26, 2019, Magistrate Judge Cheesbro recommended that this Court deny Defendants' motions. (Doc. 411 at 1). On May 28, 2019,

---

[3] Abbreviations: PSR refers to Defendants' presentence investigation reports generated by the probation office; PSR Add. refers to the Addendum to the presentence investigation reports; and Sent. Rec. refers to Defendants' sentencing recommendation sheets made by the probation office.

[4] Trotta filed his motion to dismiss on July 3, 2018. (Doc. 171).

Defendants filed objections to Magistrate Judge Cheesbro's Report and Recommendation.  (Docs 429, 431-433, 437, 498-499, 502).  On August 7, 2019, this Court held oral argument on the matter.  (Doc. 504 at 1).  In an order filed August 26, 2019, this Court overruled Defendants' objections, adopted Magistrate Judge Cheesbro's Report and Recommendation in part, and denied Defendants' Motions to Dismiss.  (Doc. 504 at 1-2).

Defendants' jury trial began on October 21, 2019.  (Docs. 696, 704-710).  On October 24, 2019, the jury found Defendants guilty on all counts of the indictment. (Docs. 704-710).  Defendants are now before the Court for sentencing.

## III.  ARGUMENT

### DEFENDANTS SHOULD BE SENTENCED TO A TERM OF IMPRISONMENT WITHIN THE ADVISORY GUIDELINE RANGE.

The Government has compelling interests in ensuring "the safety of those on Kings Bay [ ], the security of the assets housed there, and the smooth operation of the base." (Doc. 504 at 15).  On April 4, 2018, Defendants' unauthorized entry on Kings Bay preempted those interests.  The seriousness of Defendants' conduct, as well as the need to deter further similar crimes by Defendants and others, warrant a sentence of imprisonment within the advisory guideline range.  Only prison time would promote just punishment for the crimes and respect for the law.

### a.  Governing Law

"When deciding upon a sentence, [this Court] must evaluate all of the"

factors in 18 U.S.C. § 3553(a).  *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014).  The factors include:  "(1) the nature and circumstances of the offense and history of the defendant;" "(2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "(3) the need for deterrence;" "(4) the need to protect the public from further crimes;" "(5) the need to provide the defendant with needed educational or vocational training or medical care;" "(6) the kinds of sentences available;" "(7) the Sentencing Guidelines range;" "(8) pertinent policy statements of the Sentencing Commission;" "(9) the need to avoid unwarranted sentencing disparities;" and "(10) the need to provide restitution to victims."  *Id.* at n.2 (citing § 3553(a)).  The factors most relevant to Defendants are detailed below.

### b.  Kinds of Sentence and Sentencing Range[5]

#### i.  By Statute

By statute, Defendants are subject to a term of custody for not more than five years on counts one and two; not more than ten years on count three; and not more than six months on count four. Afterwards, they are subject to a term of supervised release for one to three years on counts one through three and up to one year on count four. *But see United States v. Cruz*, 129 F. Supp 2d 424 (D. P.R. July 26, 2000) (deciding that trespassing on federal naval property was not subject to supervised release because it is a petty, misdemeanor offense).  Defendants are also

---

[5] The Government relies on the sentencing recommendation sheets for Defendants provided by the probation office.

subject to a term of probation for one to five years on counts one through three and up to five years on count four.  They are subject to a fine of $250,000 for counts one through three and a fine of $5,000 for count four.  Lastly, they are subject to pay restitution in the amount of $33,503.51, and special assessments of $100 for counts one through three and $10 for count four.

### ii. Advisory Guidelines

#### 1. Kelly

Under the advisory guidelines, Kelly has a total offense level of 14 and a criminal history category of IV.  He is subject to a term of imprisonment for 27 to 33 months followed by supervised release for one to three years on counts one through three, is ineligible for probation, subject to a fine between $7,500 and $75,000 with $33,503.51 owed in restitution to the United States Navy, and subject to special assessments of $100 for counts one through three and $10 for count four.

#### 2. Colville

Colville has a total offense level of 14 and a criminal history category of III. He is subject to a term of imprisonment for 21 to 27 months followed by supervised release for one to three years on counts one through three, is ineligible for probation, subject to a fine between $7,500 and $75,000 with $33,503.51 owed in restitution to the United States Navy, and subject to special assessments of $100 for counts one through three and $10 for count four.

#### 3. Grady

Grady has a total offense level of 14 and a criminal history category of III.

Like Colville, she is subject to a term of imprisonment for 21 to 27 months followed by supervised release for one to three years on counts one through three, is ineligible for probation, subject to a fine between $7,500 and $75,000 with $33,503.51 owed in restitution to the United States Navy, and subject to special assessments of $100 for counts one through three and $10 for count 4.

### 4.  Hennessy

Hennessy has a total offense level of 14 and a criminal history category of II. She is subject to a term of imprisonment for 18 to 24 months followed by supervised release for one to three years on counts one through three, is ineligible for probation, subject to a fine between $7,500 and $75,000 with $33,503.51 owed in restitution to the United States Navy, and subject to special assessments of $100 for counts one through three and $10 for count four.

### 5.  McAlister

McAlister has a total offense level of 14 and a criminal history category of I. She is subject to a term of imprisonment for 15 to 21 months followed by supervised release for one to three years on counts one through three, is ineligible for probation, subject to a fine between $7,500 and $75,000 with $33,503.51 owed in restitution to the United States Navy, and subject to special assessments of $100 for counts one through three and $10 for count four.

### 6.  O'Neill

O'Neill has a total offense level of 14 and a criminal history category of II.  He

is subject to a term of imprisonment for 18 to 24 months followed by supervised release for one to three years on counts one through three, is ineligible for probation, subject to a fine between $7,500 and $75,000 with $33,503.51 owed in restitution to the United States Navy, and subject to special assessments of $100 for counts one through three and $10 for count four.

### 7.  Trotta

Trotta has a total offense level of 14 and a criminal history category of III. He is subject to a term of imprisonment for 21 to 27 months followed by supervised release for one to three years on counts one through three, is ineligible for probation, subject to a fine between $7,500 and $75,000 with $33,503.51 owed in restitution to the United States Navy, and subject to special assessments of $100 for counts one through three and $10 for count four.

### c.  Government's Sentencing Recommendation

Given the options above, the Government recommends that Defendants be sentenced to a term of imprisonment within the advisory guidelines.[6] Additionally, the Government asks that Defendants be ordered to jointly and severally pay restitution in the amount of $33,503.51 to the United States Navy. Although Defendants have asked the Government to consider recommending a sentence of home confinement, they have so far not provided the Government with any relevant facts or authority in support.  Rather, they largely rely on their old age

---

[6] Because McAlister has already served a period of at least 17 months in pre-trial detention, the Government asks that her prison sentence be "time served."

9

to excuse their criminal behavior.  Any sentence less than imprisonment within the guideline range would not reflect the seriousness of the offense or promote respect for the law.  Nor would such a sentence adequately deter criminal conduct or protect the public from Defendants' further crimes.

### i. Under § 3553(a)(2)(A), Government's sentencing recommendation reflects seriousness of the offense and promotes respect for the law.

Defendants unlawfully entered Kings Bay, under the cover of darkness, and caused at least $33,503.51 worth of damage to base property.  This conduct, for which Defendants have shown no remorse, was so serious that it warrants a term of imprisonment.  Instead of pursuing lawful avenues of protest, Defendants organized and planned their crime over the course of two years, which was dangerous not only to themselves but to Naval security forces and national security.  "Protecting government property, especially the supply of nuclear weapons, is essential to public peace, order, and safety."  *United States v. Allen*, 760 F.2d 447, 452-453 (11th Cir. 1985).  "A more fundamental interest does not readily come to mind."  *Id.* at 452.

### 1. Organization and Planning

As shown at trial, Defendants spent two years planning their crimes.  They traveled from their home states to Jacksonville, Florida where they met to discuss specifics.  They conspired to unlawfully enter Kings Bay in the dark.  (Doc. 411 at 22).  Defendants anticipated confrontation with base officials and believed that that

10

the nighttime entry would have a practical advantage by making it easier to avoid detection.  (Doc. 313 at 92).

## 2.  Danger

Defendants' conduct involved the conscious or reckless disregard for the risk of death or serious bodily injury.  As Captain Brian Lepine, the base commander of Kings Bay, testified at the pre-trial hearings, unauthorized intruders "endanger the safety of the base personnel, the security of the vital facilities and assets on the base, and even [the intruders'] own safety."  (Docs. 411 at 9-10; 227-1 at 6).  Captain Lepine stressed the importance of security protocols to protect the docked submarines on the base and the need to prevent unauthorized access to them since the ballistic and guided missiles on board are vital assets to national security.  (Doc. 411 at 11).  He explained that "protecting a submarine [at port] requires elaborate combination of personnel, technology, communication, and concepts of operation." (Doc. 227-1:3-4).  Moreover, as referenced above, security forces are authorized to use deadly force against intruders.  They respond to unauthorized intruders "armed with loaded weapons" and "are trained to use them."  (Doc. 316 at 226).  As this Court noted, "*[s]uch a situation can lead to tragic consequences* because 'whenever you have individuals placed in a stressful environment where they don't necessarily fully understand their adversary or what they're up against, there is potential for things to go wrong.'"  (Doc. 504 at 14) (quoting (Doc. 316 at 226-227)) (emphasis added).  Thus, by entering Kings Bay and its most sensitive areas without permission, Defendants put themselves and base personnel at risk.  Consequently,

the probation office correctly applied a two-level increase[7] to Defendants'

recommended sentence calculation under § 2B1.1(16)(A) of the guidelines.[8]  *See, e.g.*,

Kelly PSR Add. at 4.

Relying on *United States v. Benton*, 323 F. Supp. 2d 903 (E.D. Wis. 2004),

Defendants argue that the enhancement does not apply to them.  In *Benton*, the

Government sought the enhancement against a defendant who sold two airplanes

after falsely certifying that the planes had received annual inspections.  *Id.* at 904.

The district court concluded that the enhancement did not apply reasoning that the

Government failed to show that the defendant was aware of the risk of serious

bodily injury or death.  *Id.* at 906-907.  Unlike in *Benton*, here, the Government has

presented evidence showing Defendants' awareness.  As outlined above, Defendants

specifically chose to enter the base at night to avoid detection.  (Doc. 313 at 92).

Defendants also heard the broadcast warning that lethal force could be used against

them though it did not deter their intrusion.  (Doc. 313 at 117-118).  Notably, Trotta

acknowledged that both their decision and approach to enter Kings Bay took

"extraordinary act[s] of will."  (Doc 313 at 117-118).  He explained that after "quite a

---

[7] However, "[i]f the resulting offense level is less than level 14," it is "increase[d] to
level 14."  U.S.S.G. § 2B1.1(16)(A).

[8] The plain language of § 2B1.1(16)(A) indicates that "the conscious or reckless risk
of death or serious bodily injury" applies equally to Defendants as well as others.
*Compare* U.S.S.G. § 3C1.2 (applying risk of death or serious bodily injury to
"*another person.*") (emphasis added); *United States v. Belfast*, 611 F.3d 783, 813-814
(11th Cir. 2010) (holding that where the statute is unambiguous, the plain meaning
controls).

bit of discernment," he decided that if he died as a result of his actions, his death "would be a worthy sacrifice."[9]  (Doc 313 at 117-118).

Importantly, *this Court* specifically found that "*Defendants' unauthorized access could have easily led to deadly consequences* and did in fact interrupt operations at the base (which could have interrupted military operations elsewhere that relied on the operations on the base)."  (Doc. 504 at 17) (emphasis added). This Court noted that "[e]ven when security personnel responding to unauthorized intruders does not lead to lethal results . . . , such an incident 'puts the entire security contingent on [Kings Bay] on alert, which is disruptive to normal day-to-day operations.'"  *Id.* at 14 (quoting (Doc. 316 at 227-228)).  Accordingly, the Court is well within its discretion to determine that Defendants were aware that their conduct posed a conscious or reckless disregard for the risk of death or serious bodily injury.  Enhancement and a term of imprisonment under the sentencing guidelines is proper.  *See generally*, *United States v. Henderson*, 893 F.3d 1338, 1352 (11th Cir. 2018) (applying enhancement where the defendant made false entries in patients' hospital records); *United States v. Moran*, 778 F.3d 942, 977-978 (11th Cir. 2015); *United States v. Thorstead*, 439 Fed. Appx. 580, 582-583 (9th Cir. 2011) (applying enhancement where the coast guard responded to the defendant's false distress calls with rescue aircraft and personnel, which testimony described as

---

[9] Moreover, Defendants refer to their conduct as the performance of a religious sacrament.  (Doc. 411 at 16).  A defense expert testified at the pre-trial hearings that sacraments performed outside of the church setting usually involve death. (Doc. 411 at 18 n.14).

13

"inherently dangerous."). Proper punishment ensures the security and safety of the base and its personnel from the dangers created by Defendants' actions.

### 3. Damages

The seriousness of Defendants' crimes is further reflected by the damages the United States Navy suffered. The damages inflicted by Defendants on the base and base property exceeded $30,000. *See, e.g.*, Kelly PSR at 6. Repair for the Limited Area cost $1,341; removal of graffiti from the missile display was $417.66; removal of graffiti from the Engineering Services Building was $1,190.96; and labor and materials cost $30,553.89 for a total loss of $33,503.51. *See, e.g.*, Kelly PSR Add. at 3.

### 4. Disrespect for the Law

Defendants could have protested nuclear weapons without running afoul of the criminal laws. They specifically could have protested at Kings Bay without violating the laws for which they were convicted. For example, protests are permitted at Bancroft Memorial, which is located on Kings Bay, but just outside of the perimeter fencing. (Doc. 411 at 57). Furthermore, at the pre-trial hearings, Government witnesses explained that the base commander has authority to approve protests both inside and outside of the perimeter fencing. (Doc. 411 at 55). In fact, the base commander has approved protests on base property in the past. (Doc. 411 at 55). The Pax Christi group, a Catholic peace organization, regularly holds candlelight vigils on Kings Bay on New Year's Eve. (Doc. 411 at 13-14). It also routinely asks for permission to hold vigils at the Bancroft Memorial. (Doc. 411 at

14

13-14).  Nothing in Defendants' testimonies indicates that they could not have protested at Bancroft Memorial instead of behind the perimeter fencing.  Nor did Defendants testify that they were religiously prohibited from asking for permission to protest "or that their religious beliefs would have been burdened by asking for permission."  (Doc. 411 at 56).  Notably, Hennessy and Colville testified that they could have protested on an area of the base set aside by base command.  (Doc. 411 at 56).  McAlister testified that she would have given "prayerful consideration" to this option, and O'Neill stated that he found the idea of an approved protest "interesting" and wanted to "hear more about it."  (Doc. 313 at 142, 168).  Moreover, Kelly conceded that "perhaps [he] could have been persuasive in other ways that were not exhausted."  (Doc. 316 at 151-152).

Although Defendants could have acted through a Government-approved protest, clearly they decided not to ask.  O'Neill testified that "in order to get some attention to [their] issue, [they] had to do something spectacular" to g[e]t the attention of the [G]overnment."  (Doc. 313 at 169-170).  What is more, according to Kelly, Defendants' protest did not end with their actions at Kings Bay.  He explained that these criminal proceedings provide a continuation of their protest and an additional opportunity to spread their message.  (Doc. 411 at 31).  Accordingly, Defendants have blatantly disrespected the law.  They endangered themselves and Kings Bay under the guise of protest when more peaceful avenues of relief were available and continue to engage in such protest by way of the courts.  This Court should give such disrespect due consideration in imposing sentence.

15

### 5.  No Remorse

Defendants have shown no remorse for their crimes.  This Court should consider their lack of remorse in assessing the seriousness of their conduct before imposing sentence.  At trial, Kelly asserted that he was justified in his actions and that he had a moral imperative to commit the instant offense.  Similarly at trial, O'Neill testified that he was justified in his actions and had a moral imperative to commit the crimes.  During her testimony, Grady stated that she did not believe that her actions caused damage or destruction to the property at the base or that she did anything wrong.  Most importantly, on October 24, 2019, following their guilty verdicts, Defendants continued to express their belief that their actions were justified.  For example, Hennessy stated that "the efficiency of the state can never be underestimated . . . we are called to keep trying and we will do this together." Hennessy PSR Add. at 5.  Trotta echoed, "Keep on keeping on.  Resist."  Trotta PSR Add. at 4.  Thus, Defendants have shown no remorse or appreciation for the seriousness of their offense.  Only a prison sentence within the guideline range would promote respect for the law.

> ii. **Under § 3553(a)(2)(B) and (C), Government's sentencing recommendation would deter criminal conduct and protect the public from further crimes.**

According to the commentary in the sentencing guidelines, general deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggregate the need for punishment with each recurrence.  *See generally United States v. Spraggins*, 868 F.2d 1541, 1543 n.1 (11th

Cir. 1989) (citing Guidelines § 4A introductory comment).  "Defendants agreed that their criminal history includes many protest-related arrests, prosecutions, and, occasionally, convictions." (Doc. 411 at 10 n.9).  However, they continue to vandalize Government property believing that their religious beliefs outweigh the law.  They have continued the same course of criminal conduct in the name of religion and their criminal behavior has not been deterred by their prior criminal sentences.  Therefore, given their criminal history and non-compliance with previous sentences for similar crimes, this Court should sentence Defendants to a term of imprisonment within the guideline range.  Any less punishment encourages similar behavior from others and places military security forces at risk.

## 1.  Prior Similar Convictions

Each defendant has at least one prior conviction relating to similar criminal conduct.  Kelly has a total of ten prior criminal convictions relating to similar conduct.  Kelly PSR at 8-15.  The instant conviction is his 11th conviction in which he has committed an offense of trespassing and/or destruction of property in the name of faith.  Kelly PSR Add. at 3.  It is O'Neill's seventh such conviction.  O'Neill PSR Add. at 4.  Colville has similarly continued the same course of conduct.  Colville Sent. Rec. at 2.  He has eight prior convictions relating to similar conduct.  Colville PSR at 8-10.  Grady has 11 prior convictions involving similar conduct.  Grady PSR at 5.  Her previous criminal conduct has spanned a period of approximately 35 years and she remains undeterred by previously imposed sentences.  Grady Sent. Rec. at 2.  Trotta has five convictions from April 23 2003 to

June 6, 2017 relating to the same conduct. Trotta PSR at 9-10. Finally, Hennessy
has at least three prior convictions for similar crimes while McAlister has nine.
Hennessy PSR at 7-8; McAlister PSR at 9-11.

## 2. Noncompliance

What is more, Defendants' crimes have been undeterred by previously
imposed sentences to probation and supervised release. For example, after his first
conviction, Kelly's supervised release was revoked on December 10, 1997 after he
told his probation officer that he would not comply with conditions of his
supervision. Kelly PSR at 8. On August 6, 1996, Kelly refused to let his probation
officer into his home and refused to submit to a drug test. *Id.* After his second
conviction, on May 5, 1997, Kelly sent a letter to the court stating that he and his
co-defendants would not cooperate with any sentence of restitution or fines. *Id.* at
9. He specifically informed the court that, "We will not cooperate with attempts to
curb our nonviolent peacekeeping once we are released." *Id.* at 10. After his third
conviction, Kelly similarly informed the court that he would refuse to comply with
any sentence that included supervision, fines, or compulsory community service. *Id.*
After his ninth and tenth convictions, Kelly, as indicated after previous convictions,
failed to report to his probation officer following release from federal custody. *Id.* at
15. Notably, Kelly committed the instant offense *while under sentence in the
Western District of Washington. Id.* Likewise, after his first conviction on May 7,
1997, Colville refused to pay restitution and refused to obtain gainful employment
to pay the restitution.

Consequently, Defendants' criminal history, which consists of repeated similar conduct and noncompliance with non-custodial punishment, shows that the only just punishment for their crimes is prison time within the advisory guideline range. Such punishment serves as both general deterrence to others and specific deterrence to protect society from Defendants' further crimes.

### d.  No Home Confinement

Kelly is 71 years old.  Kelly PSR a 3.  Colville is 58, Grady is 61, Hennessy is 64, McAlister is 80, O'Neill is 64, and Trotta is 57.  Colville PSR at 3; Grady PSR at 4; Hennessy PSR at 3; McAlister PSR at 4; O'Neill PSR at 4; Trotta PSR at 4.  It is expected Defendants will argue that due to their age and the recent COVID-19 outbreak, they should be sentenced to home confinement.[10]  However, Defendants have not thus far provided the Government with any authority or relevant facts to warrant this variance from the advisory guidelines.  Importantly, the Court need not sentence Defendants to home confinement for reasons related to COVID-19 because the Department of Justice is mindful of the concerns it has created.

On March 26, 2020, the Attorney General issued a memorandum to the Director of the Bureau of Prisons ("BOP") to ensure that, in light of the COVID-19 pandemic, BOP utilizes home confinement, where appropriate to protect the health and safety of BOP personnel and those in BOP's custody.[11]  BOP will grant home

---

[10] McAlister has already served at least 17 months in pre-trial detention.  McAlister PSR Add. at 5.  Therefore, as referenced above, the Government asks that her sentence of imprisonment under the advisory guidelines be "time served."

confinement when it determines that, based on the totality of the circumstances for each individual inmate, that transfer to home confinement is not likely to increase the inmate's risk of contracting COVID-19.  Additionally, as part of BOP's assessment, BOP does consider the age and vulnerability of the inmate to COVID-19 in accordance with guidelines from the Centers for Disease Control ("CDC").  Should home confinement be deemed appropriate for individual inmates, BOP processes them for transfer as expeditiously as possible.  Moreover, in response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.  Notably, many inmates will be safer in BOP facilities where the population is controlled and where doctors and medical care are readily available.

Although it may seem more efficient for this Court to impose a sentence of home confinement when that is a decision BOP may ultimately make, the seriousness of Defendants' conduct coupled with the need for deterrence and protection of the community from Defendants' further crimes outweigh any speculative concerns regarding their alleged medical care under § 3553(a)(2)(D). *Cubero*, 754 F.3d at 892 ("When deciding upon a sentence, the district court must evaluate all of the § 3553(a) factors but can attach 'great weight' to one factor over

---

[11] The BOP's statutory authority to transfer prisoners to home confinement rests in 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541.  The BOP's policy and procedures regarding home confinement are outlined in BOP Program Statement 7320.01, *Home Confinement* and BOP Operations Memorandum, *Home Confinement under the First Step Act*, both of which are available on www.bop.gov via the Resources Tab.

others.") (quoting *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009)).

Here, after two years of planning, Defendants unlawfully entered and vandalized a

military naval installation instead of pursuing lawful avenues of protest.  They have

committed the same crimes time and again for which they have shown no remorse

and have not even complied with non-custodial sentences.  The Government has

compelling interests in protecting against unauthorized access to sensitive military

areas by individuals who have no security clearances, no-base provided supervision,

and who have expressed their desire to impact military operations.  Accordingly, the

only just punishment for Defendants is imprisonment within the advisory guideline

range.  Any other sentence risks the United States' national security.[12]

---

[12] In light of COVID-19, the Government would not object to a delayed surrender
date.

## IV.    CONCLUSION

For the reasons set out above, this Court should follow the Government's

Sentencing Recommendation.

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

___*s/ Karl I. Knoche*___

Karl I. Knoche
Assistant United States Attorney
Georgia Bar No. 426624

___*s/ E. Gregory Gilluly, Jr.*___

E. Gregory Gilluly, Jr.
Assistant United States Attorney*
Tennessee Bar No. 019397

___*s/ Channell V. Singh*___

Channell V. Singh
Assistant United States Attorney
Georgia Bar. No. 216540

22 Barnard Street, Suite 300
Savannah, Georgia 31401
Telephone: (912) 652-4422
Facsimile: (912) 652-4991
E-mail: channell.singh@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 12th day of May 2020.

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

<u>***s/ Channell V. Singh***</u>

Channell V. Singh
Assistant United States Attorney
Georgia Bar No. 216540

22 Barnard Street, Suite 300
Savannah, Georgia 31401
Telephone: (912) 652-4422
Facsimile: (912) 652-4991
E-mail: channell.singh@usdoj.gov